H. H. STORMS et ux., Petitioners,

v.

Grady TUCK, Jr. et al., Respondents.

No. B–7672.

Supreme Court of Texas.

March 21, 1979.

Rehearing Denied April 17, 1979.

448

Joe Mike Egan, Jr., Kerrville, for petitioners.

Joe Mike Egan, Jr., Kerrville, for petitioners.

Joe Grady Tuck, Kerrville, for respondents.

SAM D. JOHNSON, Justice.

This case involves the construction of an easement. Mr. and Mrs. Storms, plaintiffs

below and petitioners here, filed this suit seeking injunctive relief and cancellation of a cloud on title to land owned by them, the asserted cloud being an easement owned jointly by Tuck, Smith, Walters, and Graham, defendants below and respondents here. The trial court ruled in favor of the defendants, holding that Tuck, et al. owned a valid easement by virtue of both a written grant and the doctrine of estoppel in pais. The court of civil appeals affirmed on the ground of estoppel. 566 S.W.2d 16. We reverse the judgment of the court of civil appeals in part, affirm in part, and remand the cause to the trial court for rendition of a proper judgment.

The diagram reproduced below will be useful in understanding the facts of this case.

Mr. and Mrs. Storms owned 848 acres of land in Kerr County. The land lies about one-half mile east of the state highway that runs between Bandera and Kerrville. In 1971 the Stormses built a house in the northeast corner of their land. In order to reach the Bandera highway from the house, they constructed a fifty-foot-wide private road on their property. The road ran along the northern border of their and their neighbor's land for nearly one and one-half miles, to the point where it intersected the highway.

On December 21, 1976 the Stormses sold the house that they had constructed, which was their home, and ten acres of land surrounding it to Mrs. Mills. As part of the transaction, they granted Mrs. Mills an easement over the one-and-one-half-mile-long road in the following terms:

"THAT WE, H. H. STORMS and wife, JULIA STORMS, . . . have GRANTED, CONVEYED, and by these

presents do GRANT and CONVEY unto the said RUTH MILLS, . . . her heirs and assigns, the free and uninterrupted use, liberty, privilege and easement of passing in, on, upon and along a certain way [describing the bounds of the easement] . . . together with free ingress, egress and regress to and for the said RUTH MILLS, her heirs and assigns, and her tenants, by foot, with carts, wag-

ons, carriages, automobiles and other vehicles, horses, mules or livestock, as by her shall be necessary or convenient at all times and seasons forever, in, along, upon and out of said way; TO HAVE AND TO HOLD all and singular the rights and privileges aforesaid unto her, the said RUTH MILLS, her heirs and assigns, to her proper use and behoof, in common, however, with Grantors herein, the said H. H. STORMS and wife, JULIA STORMS, their heirs and assigns."

The easement as described in the conveyance covered *not only* the one-and-one-half-mile-long existing road, but *also included* a fifty-foot-wide strip of land running down the western border of the ten acres. At the time of the conveyance, however, this additional fifty-foot-wide strip of land was not a roadway. It was nothing more than a part of the pasture on which were located several cattle pens owned by the Stormses. This additional fifty-foot-wide strip of land will be referred to as the unimproved portion of the easement since it was not part of the one-and-one-half-mile-long roadway.

Less than two months after her purchase, Mrs. Mills sold her ten acres to two separate parties on February 16, 1977. She sold the house and 9.24 acres to the Teals, together with "all her right, title and interest in and to that one certain easement," that being the easement granted by the Stormses to her.[1] On the same day, Mrs. Mills sold the remaining 0.76 acres to the defendants Tuck, et al. This remaining tract of land was fifty feet wide and six hundred sixty feet long, running along the southern boundary of the ten acres. The conveyance included "an undivided interest in and to that one certain easement" from the Stormses.

The importance of this second conveyance lay in the fact that Tuck, et al. owned 1,100 acres of land adjoining the Stormses' and Mrs. Mills' land. The record does not indicate the date on which Tuck, et al. purchased or obtained title to the 1,100 acres. Sometime after the purchase of the 0.76 acres, Tuck, et al. brought in road building equipment and turned the 0.76-acre tract into a road, fifty feet wide and six hundred sixty feet long. In addition, Tuck, et al. built a road over the fifty-foot-wide unimproved portion of the easement running down the western border of the ten acres. The total cost of this roadway was nearly $6,000.

On two or three occasions during the building of this roadway, Mr. Storms came out and watched the construction. During this time, at the request of one of the co-defendants, Graham, Storms agreed to move his cattle pens, which were on the unimproved portion of the easement on the west side of the ten-acre tract. On another occasion, Storms pointed out to the construction crew the boundaries of the unimproved portion of the easement in order to keep them from building the road on land not contained in the easement grant. Since the roadbed on the southwestern end of the easement was built up some five feet off the ground, Tuck, et al. built a ramp and gate there to allow Storms access to his southern pastures, and did this at Storms' request. After the roadwork was done, the bulldozer operator removed a tree stump from the one-and-one-half-mile-long road, again at Storms' request.[2] Mrs. Storms did not go on the land until after the roadwork was completed. The only contacts between the Stormses and Tuck, et al., therefore, were the two or three times described.

At no time prior to the filing of this lawsuit did the Stormses protest the building of the road either across the 0.76 acres or upon the unimproved portion of the easement. The Stormses filed suit on March 10, 1977, three weeks after Tuck, et al. had

---

1. The Teals are not a party to this lawsuit and no question is raised concerning the validity of their easement.

2. There is some dispute over this matter. Storms claims that it was a private deal between the bulldozer operator and himself, done as a favor. Co-defendant Graham claims that it was done solely in response to a request made by Storms. There is no dispute that it was done only after completion of the road and as the bulldozer operator was leaving the premises.

bought the 0.76 acres. They prayed for alternative forms of relief. First, they sought cancellation of cloud on title to their property through the extinguishment of the easement to reach the 0.76 acres. In the alternative, should the court decide that the easement gave Tuck, et al. the right to reach the 0.76 acres, the Stormses prayed for an injunction prohibiting Tuck, et al. from using the easement to go beyond the 0.76 acres and onto Tuck, et al.'s 1,100 acres. The trial court and the court of civil appeals ruled against the Stormses on both points, holding instead that the easement gave Tuck, et al. the right not only to reach their 0.76 acres, but also to go beyond it to their 1,100 acres. We are in agreement with the trial court and the court of civil appeals only to the extent that the easement will allow Tuck, et al. to reach the 0.76 acres.

■ In their first point, the Stormses argue that Tuck, et al. have no right even to reach the 0.76-acre tract, whether by the written easement grant or the doctrine of estoppel in pais. We look first to the words of the written grant to discover what restrictions, if any, are placed on the use of the easement. Those terms, set forth above, reveal the grant of an easement in very broad and general language, with no restrictions on its use other than it be used for "ingress, egress and regress." We agree with the conclusion of the court of civil appeals on this point: "[T]he easement appurtenant was for the entire 10 acres *and for any portion thereof.*" 566 S.W.2d 16 at 18. [Emphasis added.]

Having concluded that Tuck, et al. have the right to utilize the easement to reach their 0.76-acre tract, we must now consider whether the easement may be further utilized for access to the 1,100 acres. On this

point, we hold that Tuck, et al. may not utilize the easement for the benefit of the adjoining 1,100 acres.

With regard to the terms of the written easement grant, the decision of *Bickler v. Bickler*, 403 S.W.2d 354 (Tex.1966), is dispositive.

> "'Where, in connection with a transfer of property, an easement is granted for the benefit of that property over lands of the grantor, the easement is presumed to be appurtenant to the granted premises, and in the absence of words creating a more extended right the grantee or his successor in interest is not entitled to use the easement for the benefit of other premises owned by himself or another.'" 403 S.W.2d 354 at 359.

Indeed, Tuck, et al. do not seriously dispute this point. It appears to be conceded that they will win, if at all, by the doctrine of estoppel in pais.

■ The doctrine of estoppel in pais as it relates to easements is a legal theory the exact nature and extent of which has not been clearly defined. While it is frequently applied in a few definite categories of suits involving land, the authority for its application outside those categories is "rare and nebulous." *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 209 (Tex.1962).[3] As generally stated, the doctrine holds that the owner of land may be estopped to deny the *existence* of an easement by making representations that have been acted upon by a purchaser to his detriment. *Drye v. Eagle Rock Ranch, Inc., supra.* The doctrine generally is resorted to as an exception to the statutes requiring a writing. Note, 13 Baylor L.Rev. 180 (1961). Being a creature of equity, it seeks to prevent injustice and to protect innocent parties from fraud.[4]

---

3. There would appear to be three definite categories of suits in which the doctrine will apply: (1) dedication of a street, alley, or square; (2) conveyance with reference to a map or plat; and (3) expenditures by the owner of the alleged easement for improvements on the servient estate. *Drye v. Eagle Rock Ranch, Inc., supra*, at 209 10.

4. Indeed, one writer has unequivocally stated: "An easement is not created by equitable es-

toppel except in cases of fraud." 1 G. Thompson, Real Property § 355 at 573 (1939). Tuck, et al. claim that this is a classic case calling for the hand of equity to act. To quote their brief: "... Petitioners' [Stormses'] action throughout this case have [*sic*] been conducted in bad faith, with the intent to enrich themselves through others' money, and with unclean hands."

At the outset, we would note that this case differs in two significant aspects from the traditional case asserting an easement by estoppel. First, in the traditional case, there generally is no written grant of an easement; instead, there is a parol grant or a representation that an easement already exists. In the instant case, however, we are faced with an express written grant of an easement. Secondly, in the traditional case, the issue revolves around the very existence of the easement. By contrast, this case entails the scope of an easement; its existence is not questioned. Tuck, et al. reason, however, that the existence and the scope of the easement are inseparable; the easement exists, if at all, for the benefit of the 1,100 acres. The Stormses, on the other hand, argue that this distinction is all important. Although their words and conduct might be construed as harmonious with and supportive of Tuck, et al.'s right to build the road pursuant to the terms of the written easement grant, the Stormses argue that nothing they said or did estops them from complaining about the improper use of the easement. Keeping these distinctions in mind, then, the question before us is whether the Stormses, by words or conduct, represented to Tuck, et al. that the easement to reach the 0.76 acres could also be utilized for the benefit of the 1,100 acres, which led Tuck, et al. to build the road connecting the 0.76 acres (and incidentally the 1,100 acres) to the one-and-one-half-mile-long roadway.

Essential to the creation of estoppel is that the misrepresentation be communicated to, believed, and relied upon by the innocent party. No one has suggested and the record is devoid of any evidence indicating that the Stormses ever told anyone that the easement could or could not be used for any purpose whatsoever. There is nothing to suggest that Tuck, et al. were prompted to buy either the 1,100 acres or the 0.76 acres by any statement or conduct of the Stormses. It is equally obvious that Tuck, et al.'s decision to build the road over the 0.76-acre tract and the unimproved portion of the easement was one of their own making, completely uninfluenced by the Stormses. The record reflects that the first contact between the Stormses and Tuck, et al. came when Mr. Storms went out to observe the road building *already in progress*. Mrs. Storms did not see the road until it was completed and never talked to any of the defendants. It is clear, therefore, that all investment decisions had already been made when Mr. Storms entered the scene and observed the roadway construction work. Consequently, there is no support for the argument that Tuck, et al. relied to their detriment upon representations of the Stormses when making their initial decisions to buy the land and build the road. As a result, their case for easement by estoppel is seriously prejudiced. At best, Tuck, et al. can claim that the Stormses are estopped because they induced Tuck, et al. to *continue* the roadway project already begun.

In this connection, Tuck, et al. make much of the fact that the Stormses remained silent and voiced no protest until completion of the road, at which time they could reap the benefit of Tuck, et al.'s labors. The implication here is that Tuck, et al. would have halted work on the roadway had they known of the Stormses' objections. It is argued that silence itself can be a form of misrepresentation. While this is a correct rule of law, it is not applicable to this case. The principle of estoppel by silence arises where a person is under a duty to another to speak, but refrains from doing so and thereby leads the other to act in reliance on a mistaken understanding of the facts. *A. R. Clark Investment Company v. Green*, 375 S.W.2d 425 (Tex.1964). The duty to speak does not arise until the silent party is himself aware of the facts. *Cf. Richey v. Miller*, 142 Tex. 274, 177 S.W.2d 255 (1944) (no duty to speak when ignorant of the facts), *with Barksdale v. Allison*, 210 S.W.2d 616 (Tex.Civ.App.—Eastland 1948, no writ) (duty to speak when aware of facts).[5]

*Barfield v. Howard M. Smith Company of Amarillo*, 426 S.W.2d 834 (Tex.1968). Of

---

5. Even then there may be no duty to speak out if the other party has equal access to the facts.

■ The question is therefore presented: was there a duty on the part of the Stormses to speak out and protest the building of the road? We cannot say that there was. Whatever might be speculated, the record does not show when the Stormses became apprised of Tuck, et al.'s intention to use the easement to reach the 1,100 acres. There is nothing to indicate whether the Stormses understood these intentions from the beginning and purposely remained silent until the road was built, or whether they learned of the planned use of the easement on one day and filed suit the next.[6] Without such knowledge, they could raise few legal objections to the building of the roadway. They certainly could not have prevented Tuck, et al. from turning the 0.76 acres into a road, since Tuck, et al. owned the fee simple title to that land. Nor could they protest the mere building of the road on the unimproved portion of the easement, since Tuck, et al., as easement owners, would be entitled to such rights as were incident, essential, or necessary to the enjoyment of the easement. *Bickler v. Bickler, supra,* at 207. The Stormses could not object to the *building* of the road for the benefit of the ten acres or any portion thereof. Their only complaint could lie against the *use* of the easement to benefit the 1,100 acres, which is exactly the complaint of this lawsuit. Accordingly, we hold that the silence of the Stormses did not create an easement by estoppel.[7]

■ As a part of this argument, Tuck, et al. rely on the fact that they expended a considerable sum of money in building the road on the servient estate. For authority, they cite the following sentence from the *Drye* opinion:

"The doctrine of estoppel in pais has been applied when the seller allows the purchaser to expend money on the 'servient' tract, as for example a drainage ditch across the grantor's land, or a house or other structure which encroaches on the land of the 'servient' estate." *Drye v. Eagle Rock Ranch, Inc., supra,* at 210.

This is a correct statement of the law; however, the factual context of the types of cases referred to must be understood. Those cases generally present situations wherein the owner of the servient estate has verbally promised to convey an easement, has verbally granted an easement, has stated that an easement exists when in fact it does not, or has remained silent in the face of a duty to speak, in reliance on which the other party expends money in making improvements. *See, e. g., Harrison v. Boring,* 44 Tex. 255 (1875); *North Clear Lake Development Corp. v. Blackstock,* 450 S.W.2d 678 (Tex.Civ.App.—Houston [14th Dist.] 1970, writ ref'd n. r. e.); *Harris v. Rabe,* 375 S.W.2d 919 (Tex.Civ.App.—Waco 1964, no writ); *Union Properties Company v. Klein,* 333 S.W.2d 864 (Tex.Civ.App.—

course, the relationship of the parties may be of critical importance as where there is a fiduciary relationship, or the silent party by reason of his superior knowledge and judgment of the subject matter lulls the other party into an uncritical acceptance of his silence.

6. The Stormses' original petition alleged that the road was not completed and prayed for injunctive relief prohibiting any further construction work. Tuck, et al.'s answer, filed one week later, alleged that the road was already built.

7. Perhaps this serves to highlight the different perspectives of the parties. Tuck, et al. claim that Mr. Storms' silence indicated his acquiescence to the intended use of the easement. Mr. Storms argues that his silence indicated his acceptance of Tuck, et al.'s right to build a road in conformance with their easement rights, but

did not compromise his right to complain of an improper use of the easement. One writer has suggested that the doctrine of estoppel by silence has narrow limits: "Ordinarily, . . . one's mere acquiescence in the making of improvements by another for the purpose of making a use of the latter's land, which involves a violation of a natural right appertaining to the former's land, involves no estoppel to deny the existence of an easement in diminution of such natural right. Furthermore, the fact that an owner observes others using a way he has opened across his land for his own use, doing so in a manner not tending to injure or interfere with his use of the way, does not imply that he is yielding anything of his ownership or that the use by the others is hostile to his ownership." 3 H. Tiffany, The Law of Real Property § 801 at 318 (3d ed. B. Jones 1939 & Supp.1978).

Eastland 1960, writ ref'd n. r. e.); *Carleton v. Dierks*, 203 S.W.2d 552 (Tex.Civ.App.—Austin 1947, writ ref'd n. r. e.). The doctrine of estoppel then prevents the owner of the servient estate from asserting the statute of frauds as a defense in denial of the existence of the easement. Not involved are situations such as the instant case where the aggrieved party spends money for improvements on his own land and on the servient estate *pursuant to a written grant.*

■ Tuck, et al. next argue that the Stormses made affirmative misrepresentations about the easement by cooperating in the building effort. This cooperation took the form of Mr. Storms moving his cattle pens and pointing out the boundaries of the unimproved portion of the easement. It is important to keep in mind here that Storms was merely following the terms of the written easement grant. Had Storms remained silent and allowed the road to be built over parts of his land not contained in the written easement grant, or had he directed such construction, then Tuck, et al.'s position would be more persuasive. Under the facts in this record, however, Storms' conduct makes no case of misrepresentation or fraudulent inducement. *See Pioneer Natural Gas Company v. Russell*, 453 S.W.2d 882, 886–87 (Tex.Civ.App.—Amarillo 1970, writ ref'd n. r. e.).

■ Finally, Tuck, et al. argue that the Stormses are estopped from denying the validity of the easement because they have accepted the benefits of the roadway by having a gateway and ramp built and a tree stump removed from the one-and-one-half-mile-long road. Before Tuck, et al. built the road on the unimproved portion of the easement, Mr. Storms had driven his truck across his land and from time to time across portions of the unimproved easement property on the west side of the ten-acre tract in order to reach his southern pastures. Since the roadbed was built up some five feet off the ground, a ramp was necessary in order for Storms to continue to have this access. In that sense, therefore, the Stormses did not benefit from the ramp; they only retained a right of access that they had previously enjoyed. The removal of the tree stump from the one-and-one-half-mile-long road was a matter of minimal consequence. At most, it presents an acquiescence to the building of the road, as opposed to its use to reach the 1,100 acres.

The question that might be asked at this point is what else could have prompted the actions of Tuck, et al., if not the conduct of the Stormses? Additional facts appearing in the record may prove illuminating. Tuck is a realtor who, along with the other co-defendants, admittedly bought the 1,100 acres as a speculative investment.[8] The pleadings, proof, and written briefs made it clear that Tuck, et al., at least at the outset, believed the one-and-one-half-mile-long private road built by the Stormses in 1971 was a county road. In this belief they were mistaken and at trial, therefore, they were forced to fall back on the doctrine of estoppel in pais. In the *Drye* opinion this court recognized that the doctrine of easement by estoppel has been applied to a "narrow band of cases." 364 S.W.2d 196 at 210. This case does not fall within that narrow band.

The trial court and the court of civil appeals both denied the Stormses relief in any form. By our judgment, we grant the relief prayed for by the Stormses in part and deny it in part. The Stormses are entitled to an injunction permanently restraining Tuck, et al. from utilizing the easement for the benefit of the 1,100 acres. The Stormses are not entitled, however, to an injunction restraining Tuck, et al. from utilizing the easement for the benefit of the 0.76 acres, nor are they entitled to extinguishment of the easement. This cause is remanded to the trial court for rendition of a judgment in accordance with this opinion.

8. Tuck, et al. apparently planned to subdivide the land. By the time of trial, just four weeks after the purchase of the 0.76-acre tract, they had a contract of sale pending for a part of the tract, contingent upon obtaining access to the Bandera highway.